# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Nickolas L. Ewing,

                 Plaintiff,

                           Case No. 1:23-cv-1304-MLB

v.

Keybo Taylor, Gwinnett County
Sheriff, et al.,

                  Defendants.

_____/

## <u>OPINION & ORDER</u>

Plaintiff Nickolas Ewing sued Defendants Gwinnett County Sheriff Keybo Taylor and Deputies Steven Hardy, James Hall, Jeremy Lopez, William Hall, Christopher Fusi, Dustin Henry, Marcus Cole, Kyle Black, Neil Butler, and Wyld Perez for injuries he received during his arrest and subsequent pre-trial detention. (Dkt. 52.) Defendants move for judgment on the pleadings. (Dkts. 54; 55.) The Court grants their motion.

## I.    Background[1]

### A.    Arrest

On the night of March 25, 2021, Gwinnett County Sheriff's Office deputies went to Plaintiff Nickolas Ewing's residence to arrest him on an outstanding warrant for aggravated stalking and felony probation violation.  (Dkt. 52 ¶ 41.)  Deputy Marcus Cole was one of the responding officers.  (*Id.* ¶ 56.)  He brought K-9 Kimbo, a trained police dog, to assist.  (*Id.* ¶ 52–57.)  Deputy Cole kept K-9 Kimbo leashed the entire time.  (*Id.* ¶ 57.)

For about an hour, the Deputies tried to get Plaintiff to come out of the house.  (Dkt. 53-1 (Hardy bodycam) at 8:00–1:04:00.)  Deputy Hardy's bodycam footage shows the officers ringing Plaintiff's doorbell multiple times (*id.* at 8:15, 9:05); repeatedly banging on his door and calling for his surrender (*id.* at 10:50, 12:25, 33:50, 37:50, 41:50, 54:00); and calling Plaintiff's cell phone (*id.* at 15:30).  During that hour, officers repeatedly warned Plaintiff that, if he did not come out, they would force their way

---

[1] The Court's factual recitation is based on the allegations in the complaint and the bodycam footage attached to Defendants' answer.  As explained in Section III.A, *infra*, the Court may properly consider the bodycam footage under the incorporation-by-reference doctrine.

into the house and "send in a dog." (*Id.* at 10:50–13:25, 34:00, 37:50, 41:50, 50:00, 51:45, 54:00, 103:35.)

At about 11:10 p.m., the officers kicked down a door and went inside. (*Id.* at 104:27.) Bodycam footage shows there were few lights on in the home. (*Id.*) Once inside, the officers issued three additional announcements that "anyone inside" needed to come out with their hands up "or they [would] be dog bit." (Dkt. 53, Ex. A (Hardy bodycam) at 1:04:30-05:02.) Plaintiff alleges he was asleep until the officers forced entry, at which point he awoke, "went into his bathroom to relieve himself," and got dressed. (Dkt. 52 ¶¶ 48–51.)

When no one responded, Deputy Cole lengthened K-9 Kimbo's leash so the dog could enter different rooms in search of Plaintiff. (Dkt. 53, Ex. A (Cole bodycam) at 12:45–13:30.) Another occupant of the home surrendered as instructed and was not bit by the dog. (*Id.* at 11:12.) Detective Cole and K-9 Kimbo continued moving through the house. (*Id.*) Less than a minute later, K-9 Kimbo found Plaintiff standing in a closet and began to bite his ankle. (*Id.* at 13:40.) Deputy Cole and other officers found Plaintiff and commanded him to get on the ground with his hands behind his back. (*Id.*) Plaintiff complied, and Deputy Cole began to

remove K-9 Kimbo from Plaintiff's ankle as other officers placed Plaintiff in handcuffs. (*Id.* at 14:00.) Plaintiff claims K-9 Kimbo continued biting him even after officers cuffed him. (Dkt. 52 ¶ 57.)

## B.    Pre-trial Incarceration

Plaintiff alleges that, while detained at the Gwinnett County Detention Center, Deputy Perez gave him plastic bags for wrapping his injured ankle while showering and told Plaintiff to return them afterwards because they were considered "contraband." (*Id.* at ¶76.) After showering, Plaintiff went to "medical" to have his wounds rebandaged. (*Id.* at ¶ 77.) Deputy Perez then told him to go back to his cell. (*Id.* at ¶ 78.) Plaintiff alleges that, when he reached his cell, he realized he still had some of the bags so he went to return them. (*Id.* ¶ 79.) He says Deputy Perez confronted him and told him he would be placed in solitary confinement for being out of his cell without permission. (*Id.*)

Disciplinary records attached to Defendants' answer paint a different picture. They indicate Deputy Perez referred Plaintiff to the jail's disciplinary board for "unauthorized absence from assigned area" and "tampering with a locking device." (Dkt. 53-2 at 3.) An incident

report indicates video from the jail showed Plaintiff (and his cellmate) tampered with their cell door by "holding it to where it appear[ed] to [be] locked" and then left their cell to use the phone. (*Id.* at 4.) Jail officials offered Plaintiff 23 days in solitary confinement as punishment, but he requested a hearing. (*Id.* at 6.) At that hearing, Plaintiff continued to insist he left his cell to return the plastic bags. (*Id.*) When jail officials told him about the video, Plaintiff accepted the offer of 23 days in solitary confinement. (*Id.* at 6-7.)

### C.    Procedural History

Plaintiff filed suit against Defendants, claiming violations of the Fourth Amendment, Fourteenth Amendment, and Georgia state law. Specifically, Plaintiff alleges Deputy Cole used excessive force by deploying K-9 Kimbo during his arrest, in violation of his Fourth Amendment rights. (Dkt. 52 ¶ 90.) He asserts several other constitutional claims that stem from the excessive force claim: failure to intervene against the other responding officers, failure to train against Sheriff Taylor, and Fourteenth Amendment substantive due process and equal protection claims. Plaintiff also alleges his disciplinary

proceedings were procedurally deficient and brings two procedural due process claims under the Fourteenth Amendment. (*Id.* ¶¶ 156, 166.)

Defendants moved for judgment on the pleadings as to all claims. (Dkt. 42-1.) The Court then ordered Plaintiff to amend his complaint to clarify whether he was bringing claims against Sheriff Taylor in his individual capacity. (Dkt. 51.) Plaintiff filed a fourth amended complaint, (Dkt. 52), adding claims against Sheriff Taylor individually. Defendants renewed their previous motion for judgment on the pleadings (Dkt. 54) and filed a new motion for judgment on the pleadings as to the claims against Sheriff Taylor individually. (Dkt. 55.)

## II. Standard of Review

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Cunningham v. Dist. Attorney's Off. for Escambia Cnty.*, 592 F.3d 1237, 1255 (11th Cir. 2010). "If a comparison of the averments in the competing pleadings reveals a

6

material dispute of fact, judgment on the pleadings must be denied." *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014).

A motion for judgment on the pleadings under Rule 12(c) is "substantially similar" to a motion to dismiss under Rule 12(b)(6). *Scales v. Talladega Cnty. Dep't of Human Res.*, 2012 WL 3775837, at *6 (N.D. Ala. Aug. 27, 2012). Both challenge "whether the complaint has stated a claim for relief." *Dixon v. Ga. Dep't of Pub. Safety*, 135 F. Supp. 3d 1362, 1369 (S.D. Ga. 2015); *see Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 n.8 (11th Cir. 2002). Both require the court to "accept the facts alleged in the complaint as true and view them in the light most favorable to the nonmoving party." *Cannon v. City of W. Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). And, to survive either motion, "[t]he complaint's allegations must plausibly suggest that the [plaintinff] has a right to relief, raising that possibility above a speculative level." *Boyd v. Peet*, 249 F. App'x. 155, 157 (11th Cir. 2007).[2]

---

[2] The Court recognizes *Boyd* is unpublished and not binding. The Court cites it and other unpublished decisions nevertheless as instructive. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

"The main difference between the motions is that a motion for judgment on the pleadings is made after an answer and that answer may also be considered in deciding the motion." *United States v. Bahr*, 275 F.R.D. 339, 340 (M.D. Ala. 2011).

This case involves bodycam footage, and the parties disagree over whether the Court—in applying Rule 12(c)—can consider that footage pursuant to the "incorporation-by-reference doctrine." (Dkt. 42-1 at 4.) Under that doctrine, a court may consider documents attached to an answer when deciding a motion for judgment on the pleadings, without converting that motion to one for summary judgment, "if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (extending the incorporation-by-reference doctrine to motions for judgment on the pleadings).

As to the first prong, a "document, by definition, is central to a complaint when it is a necessary part of [a plaintiff's] effort to make out a claim." *Kalpakchian v. Bank of Am. Corp.*, 832 F. App'x. 579, 583 (11th Cir. 2020). "A document is not 'central' merely because it is directly responsive to a factual allegation." *Adamson v. Poorter*, 2007 WL

2900576, at \*3 (11th Cir. Oct. 4, 2007). Rather, a "central" document is one that the Plaintiff "could have or rather in fairness should have [] attached to the complaint" because "it served as a basis for the complaint." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 n.16 (11th Cir. 1999); *see also Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005) (explaining that even where the complaint does not mention a document, "a document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of its authenticity.")

As to the second prong, "undisputed" in this context "means that the authenticity of the document is not challenged." *Horsley*, 304 F.3d at 1134. "A plaintiff can dispute the authenticity of a document simply by saying that the proffered document is not the one referred to in [his] complaint." *Kalpakchian*, 832 F. App'x. at 583.

The bodycam footage easily satisfies the requirements of the incorporation-by-reference doctrine. The bodycam footage clearly depicts the events that are central to Plaintiff's excessive force, failure to train, and failure to intervene claims. The footage captures all relevant conduct forming the basis of several counts of the Complaint and, for the most

part, provides a clear angle of the pertinent events with no visual obstructions. Notably, the footage shows two particularly clear angles of the dog bite at issue in several of Plaintiff's claims. (Dkt. 53, Ex. A at 13:40 (Officer Cole bodycam); 1:09:06 (Officer Hardy bodycam).) The bodycam footage could hardly be more central to Plaintiff's Complaint. Moreover, the bodycam footage is "undisputed" because Plaintiff does not challenge its authenticity. (Dkt. 46 at 5–6.) So the Court considers the body camera footage. Indeed, the Eleventh Circuit has affirmed that the incorporation-by-reference doctrine applies to "various types of documentary evidence," including body camera footage. *Baker v. City of Madison*, 67 F.4th 1268, 1277 (11th Cir. 2023) (permitting consideration of similarly clear bodycam footage in excessive force case); *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024) (same).

Plaintiff's sole argument against the inclusion of the bodycam footage is that it is "incomplete" and "selective." (Dkt. 46 at 6.) Even assuming this were true, this argument misses the mark. The Eleventh Circuit's incorporation-by-reference precedents merely require that the footage be "central" and "undisputed." *See Johnson*, 107 F.4th at 1300. Plaintiff's "completeness" argument does not undermine either prong.

10

*See Swinford v. Santos*, 121 F.4th 179, 188 (11th Cir. 2024) ("While the defendants' bodycam videos may be 'incomplete' in the sense that they do not show every angle of Thomas's death or the hours of footage leading up to his death, they clearly show unedited footage of the event underlying Mrs. Swinford's excessive force claim. Accordingly, the district court did not err in concluding that the video footage was authentic.").

While Plaintiff's "completeness" argument does not affect whether the footage may be considered, the Court recognizes that "at times, videos do not paint the entire picture and may contain ambiguities that are subject to interpretation." *Baker*, 67 F.4th at 1277. Accordingly, the Court will "construe all ambiguities in the video footage in favor of the Plaintiff, as [it] must at this stage." *Id.*

## III. Discussion

### A.    Counts I & II: Excessive Force Claims

In Count I, Plaintiff alleges Deputy Cole used excessive force in violation of his Fourth Amendment rights and 42 U.S.C. § 1983 when he deployed K-9 Kimbo to subdue him. (Dkt. 52 ¶ 90–98.) In Count II, Plaintiff alleges Sheriff Taylor violated his Fourth Amendment rights

under a supervisory theory of liability by promulgating an "unwritten policy of using excessive K-9 force against compliant and or peaceful suspects/individuals without outstanding warrants." (Dkt. 52 ¶ 99.) Deputy Cole argues he is entitled to qualified immunity because his use of force was objectively reasonable and did not violate the Fourth Amendment and, regardless, he did not violate Plaintiff's clearly established constitutional rights. (Dkt. 42-1 at 10–15.) Sheriff Taylor contends he cannot be liable for excessive force because Deputy Cole's use of force is not an underlying constitutional violation that can support supervisory liability. (Dkt. 55-1 at 7.)

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018). An official asserting this defense must show he "engaged in a discretionary function when he performed the acts of which the plaintiff complains." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). The burden then "shifts to the plaintiff to show that the defendant is *not* entitled to

qualified immunity." *Id.* (emphasis in original). This requires the plaintiff to show "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.*

Plaintiff does not, and could not, dispute that Deputy Cole was engaged in a discretionary function when he executed the warrant. *See, e.g.*, *Brock v. City of Zephyrhills*, 232 F. App'x. 925, 927 (11th Cir. 2007) ("The acts of obtaining and executing a warrant for an arrest and performing a search of a [] residence qualify as discretionary functions of law enforcement officers."); *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016) ("[B]ecause Suszczynski was attempting to arrest or restrain Arango, Suszczynski was clearly engaged in a discretionary capacity."). The burden thus shifts to Plaintiff to show Deputy Cole used excessive force in violation of clearly established law.

### 1. Deputy Cole Did Not Violate Plaintiff's Fourth Amendment Rights During His Arrest

"In excessive force cases, whether a plaintiff's constitutional rights were violated is governed by the Fourth Amendment's objective reasonableness standard." *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1272 (11th Cir. 2021). Under that standard, "[a]n arresting officer's

use of force is excessive if a reasonable officer would believe it is unnecessary in relation to the situation at hand." *Helm v. Rainbow City*, 989 F.3d 1265, 1273 (11th Cir. 2021). "Because determining reasonableness is an objective test, [the Court] do[es] not consider an officer's intent or motivation." *Id.* Instead, the Court judges the reasonableness of an officer's use of force "*from the perspective of a reasonable officer* on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (emphasis added). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The "reasonableness at the moment" standard means that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Id.* at 396 (internal quotations omitted). Whether an officer has used excessive force depends on the facts and circumstances of each particular case, including a non-exhaustive list of factors, such as "(1) the severity of the crime; (2) whether the individual poses an immediate threat to the safety

of the officers or others; (3) whether the individual actively resists or tries to evade arrest by flight; (4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; (6) the severity of the injury; and (7) whether officers applied force in good faith or [rather did so] maliciously and sadistically." *Jones v. Fransen*, 857 F.3d 843, 853 (11th Cir. 2017) (quoting *Graham*, 490 U.S. at 396).

Even accepting the facts alleged in the complaint as true and viewing both those facts and the bodycam footage in the light most favorable to Plaintiff, the Court finds the above considerations compel the conclusion that Deputy Cole's use of force was objectively reasonable and constitutional. First and foremost, Deputy Cole's fear of a potential ambush by Plaintiff was well-founded and created a reasonable belief of an "immediate threat to the safety of the officers." *Jones*, 857 F.3d at 853. Bodycam footage from Deputies Cole and Hardy shows the officers commanded Plaintiff to come out of his house and surrender for more than an hour before finally entering the home. During that time, the officers repeatedly rang Plaintiff's doorbell; banged on his door and called for him to surrender; used a police cruiser's loudspeaker to demand his surrender; warned Plaintiff that, if he did not surrender, they would

enter his home with a K-9 unit; and attempted to reach Plaintiff by calling his cell phone.[3]  They specifically warned that, if he did not surrender, he would get bit by the dog.  Any reasonable officer would conclude that a suspect who refused to surrender or respond to these warnings was unlikely to cooperate with law enforcement and, instead, was likely to use force to continue evading his or her arrest.

Notably, about fifty minutes after arriving at Plaintiff's residence, Deputy Hardy saw an adult male walk past a window.  Deputy Hardy told the other officers he thought that person was Plaintiff.  (Dkt. 53-1 at 56:11.)  This confirmed to everyone that someone was awake inside the house and ignoring their commands—an observation that, "from the perspective of a reasonable officer on the scene," signaled Plaintiff might

_____

[3] (*See, e.g.*, Dkt. 53-1 (Hardy Bodycam) at 8:15 (ringing doorbell), 9:05-10:40 (knocking on door and ringing doorbell), 10:50–13:25 (loud knocking and announcement "sheriff's office, come to the door! Nick Ewing, we know you're inside!"); 13:20–13:30 ("If you don't come to the door, we're going to knock it down and send in the dog!"), 15:30-17:20 (trying to call Mr. Ewing on the phone); additional efforts and announcements at approx. 34:00, 38:00, 42:00, 50:00, 54:00; 1:03:25 ("Nickolas Ewing, this is Gwinnett County Sheriff's Office, come to the door or we will force entry."); 1:04:00-05:02 (three announcements after forced entry, "Sheriff's Office, canine, anyone inside, come out with your hands up or you will be dog bit!"); 1:05:45–58 ("Nick Ewing, this is Gwinnett County sheriff's office, come forward!").)

be lying in wait to ambush them. *Graham*, 490 U.S. at 396. Although the officers later discovered the person Deputy Hardy saw was Plaintiff's roommate (who they did not know lived there), that mistake does not affect the reasonableness analysis, which precludes the use of "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Once the officers entered Plaintiff's home, they continued their efforts to secure his surrender. At least three times, the officers loudly commanded Plaintiff to present himself and surrender or risk being "dog bit." (Dkt. 53-1 at 105:48; 106:00; 106:18.) Once again, Plaintiff failed to respond, further heightening the officers' fears of an ambush or that Plaintiff otherwise posed a risk to their safety. Once inside the home, the Officers faced threatening circumstances—they did not know the layout of the home, where Plaintiff might be hiding, or who else might be in the home. Given Plaintiff's refusal to respond to them, they had no choice but to move through the home room by room. And that put them in danger of an ambush at every corner, doorway, alcove, or piece of furniture behind which someone could hide. The video shows the perilous situation the officers faced as they moved through the dark home with only flashlights to guide their way. Under these circumstances, the

decision to use K-9 force to help prevent an ambush was objectively reasonable.

The amount of force applied was also objectively reasonable, necessary, and appropriate given the circumstances. *See id*. K-9 Kimbo bit Plaintiff on the ankle, taking him to the ground. (Dkt. 53-1 at 13:40–14:10 (Cole); 1:09:06–1:09:38 (Hardy).) Deputy Cole (and other officers) were behind the dog by only a few seconds and immediately sought to remove the dog from Plaintiff's ankle. The dog kept Plaintiff in his grasp for no more than thirty-two seconds, during which time Plaintiff initially continued to resist as he tried to regain his feet. (*Id*.) The footage shows K-9 Kimbo bit Plaintiff only for as long as necessary to subdue and immobilize Plaintiff, or perhaps a few seconds longer as the officer pulled him back.

Plaintiff, however, alleges K-9 Kimbo "continued to viciously bite Plaintiff on the ankle, even after he was fully handcuffed"—a fact he says supports a finding of excessive force. (Dkt. 52 ¶ 57.) Although the Court generally must accept Plaintiff's allegations as true at this stage, "where a video is clear and obviously contradicts the plaintiff's alleged facts, we accept the video's depiction instead of the complaint's account . . . and

view the facts in the light depicted by the video . . . ." *Baker*, 67 F.4th at 1277–78. Such is the case here. The bodycam footage shows Deputy Cole removed K-9 Kimbo from Plaintiff's ankle nearly simultaneously with the final clasping of handcuffs. To the extent K-9 Kimbo bit Plaintiff "after he was fully handcuffed," it was for a matter of seconds. (Dkt. 53-1 at 14:08 (Cole); 1:09:38 (Hardy)); *see Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009) (finding continued K-9 biting until the suspect was fully handcuffed reasonable because, "regardless of whether [the suspect] was actively resisting arrest at that point, ... [the officer] had no reason to trust that [he] would not suddenly attempt to do him harm."). Defendant Cole certainly was trying to remove the dog as other officers were placing Plaintiff in handcuffs and the (possibly two) seconds of continued biting was reasonable given the dog's zealousness in protecting his fellow law enforcement officers and its (understandable) inability to turn on a dime upon the "zip" of the handcuffs closing.

Under these facts, the Court finds the amount of force Deputy Cole used, via K-9 Kimbo, was reasonable and no greater than necessary given the circumstances. Thus, not only was the decision of *whether* to use K-9 Kimbo reasonable, but *how* Deputy Cole deployed K-9 Kimbo was also

objectively reasonable. Indeed, the Eleventh Circuit has found similar—and even more violent—uses of K-9 force to subdue a suspect reasonable and constitutional, especially where the responding officers reasonably feared an ambush. *See*, *e.g.*, *Crenshaw*, 556 F.3d at 1285 (overruling district court's finding that thirty-one K-9 bites to subdue a suspect was excessive force, citing the officer's reasonable fear of an ambush: "[the officer] was not required to risk his own life by revealing his position in an unfamiliar wooded area at night to an armed fugitive who, up to that point, had shown anything but an intention of surrendering."); *Jones*, 857 F.3d at 854 ("When [plaintiff] fled police, [] he did not ultimately overtly surrender himself. Instead, he led police into physically challenging terrain with brush and boulders … and he did not respond in any way to [defendant officer's] K–9 warnings. Like the *Crenshaw* officers, a reasonable officer in one of Defendants' places could have been concerned, at the time [the K-9] was released, about entering the heavy brush to apprehend [plaintiff] and being met by a potential ambush."); *contra Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000) (finding excessive force where police officer allowed K-9 unit to bite suspect, who did not flee or resist arrest, for over two minutes).

20

Plaintiff's argument against a finding of reasonable force relies heavily on his allegation that he was asleep throughout the time the officers attempted to apprehend him. (Dkt. 46 at 20–22.) Even assuming that were true, it would make no difference. The relevant consideration is what Deputy Cole reasonably perceived prior to using K-9 Kimbo to subdue Plaintiff. And, as discussed above, it was much more reasonable for Deputy Cole to believe Plaintiff was awake and ignoring the officers' loud calls for his surrender—especially in the light of Deputy Hardy seeing an adult male walking in the house.

Plaintiff also argues the use of force was unreasonable because the officers were not arresting him for a violent crime. (Dkt. 46 at 19.) While that factor—the severity of the crime—might mitigate against the use of force in the abstract, it does not do so here given the officers' repeated efforts to effectuate Plaintiff's surrender and the clear instructions he chose to ignore. A suspect wanted for a routine or non-violent felony can present himself or herself as a danger to officers—at least enough of a danger to warrant a K-9 search—by refusing to come out of his or her home in response to a lawful order to do so. Because the Court finds no constitutional violation for excessive use of force, Deputy Cole is entitled

to qualified immunity for his use of K-9 Kimbo. *See Holloman*, 370 F.3d at 1264.

### 2. Excessive Force Claim Against Sheriff Taylor (Count II)

Although not entirely clear from the face of his Complaint, Plaintiff appears to argue in Count II that Sheriff Taylor is liable for Deputy Cole's conduct because he is Deputy Cole's supervisor. (Dkt. 62 at 9–10.) Supervisors can only be held liable for constitutional violations committed by their subordinates when either "(1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291 (11th Cir. 2009). So where there is no underlying constitutional violation, there can be no supervisory liability. Because the Court concludes Deputy Cole did not use excessive force as a matter of law, Sheriff Taylor cannot be liable in his supervisory capacity, and the Court dismisses Count II.

## B.    Counts III & VII: Failure to Intervene

Counts III and VII of Plaintiff's Complaint bring failure to intervene claims against all Defendants.[4] (Dkt. 52 ¶¶ 110–117; 136–139.) In both counts, Plaintiff alleges the Defendants "as law enforcement officers, had a duty to intervene in cases in which a fellow officer uses excessive force because their office carries with it an affirmative duty to act." (Dkt. 52 ¶ 110, 136.)  In response, Defendants argue that the failure to intervene claims necessarily fail because there was no underlying constitutional violation in which to intervene.  (Dkt. 42-1 at 10.)  The Court agrees.

An officer can—in certain circumstances—be liable for failing to intervene "when another officer uses excessive force … [and] the officer is in a position to intervene [but] fails to do so." *Priester*, 208 F.3d at 924; *see Ensley v. Soper*, 142 F.3d 1402, 1407–08 (11th Cir.1998) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a

---

[4] Count III brings failure to intervene claims against all officers who were present at Plaintiff's residence at the time of the alleged constitutional violation.  Count VII alleges failure to intervene against Sheriff Taylor and Deputy Perez, the two Defendants who were not at Plaintiff's residence.  Together, these Counts cover all Defendants.

constitutional violation … takes place in his presence, the officer is directly liable[.]").  Even assuming all Defendants were able to intervene in the allegedly excessive force—which the Complaint wholly fails to allege—there is no underlying constitutional violation to support Plaintiff's failure to intervene claims.  Counts III and VII thus fail as a matter of law.

### C.    Count IV: Failure to Train

Count IV of the Complaint alleges that Sheriff Taylor violated Plaintiff's Fourth Amendment rights by "fail[ing] to train [Gwinnett County Sheriff's Office] personnel regarding not using excessive K-9 force against compliant suspects."  (Dkt. 52 ¶118.)  Plaintiff brings failure to train claims against Sheriff Taylor in both his individual and official capacities.

Plaintiff appears to claim Sheriff Taylor is individually liable because of his role as a supervisor.[5]  (Dkt. 62 at 9–10.)  Defendant argues

---

[5] The Court has tried its best to understand Plaintiff's theories of liability as to his failure to train claims.  Count IV is rife with conclusory allegations, and it is difficult for the Court to discern both the factual and legal bases for this claim.  Plaintiff's briefing does little to provide clarity in this regard.  Based on Defendants' Motions, however, it appears they have (or believe they have) adequate notice of the failure to train claim

that there can be no supervisory liability for failure to train, as a matter of law, where there is no underlying constitutional violation. (Dkt. 55-1 at 7.) The Court agrees. *See Mann*, 588 F.3d at 1308 ("The central tenet in [supervisory liability] is a constitutional or statutory violation, which we have not found. As such, Plaintiffs' [failure to train] claims under a theory of supervisory liability fail because the underlying § 1983 claims fail."); *Hicks v. Moore,* 422 F.3d 1246, 1253 (11th Cir. 2005) ("Because we conclude that Plaintiff's constitutional rights were not violated . . . , Plaintiff cannot maintain a 1983 action for supervisory liability . . . for failure to train"). Because the Court finds no underlying constitutional violation for excessive force, Plaintiff cannot allege any facts that would state a claim for supervisory liability based on Sheriff Taylor's alleged failure to train.

Plaintiff seems to rely on a theory of municipal liability under *Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978) to assert his official capacity claim against Sheriff Taylor. To that end,

---

against them. So, the Court will not disregard Plaintiff's allegations as conclusory. *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003). To the extent the Court misunderstands anything, the fault lies with Plaintiff.

Plaintiff claims he "has made factual allegations showing an unofficial . . . practice or custom (aggressive canine use without written policies) attributable to Sheriff Taylor in his official capacity that caused Plaintiff's constitutional harms."  (Dkt. 46 at 16.)  Even taking those allegations as true, Plaintiff cannot sustain a *Monell* claim against Sheriff Taylor in his official capacity in the absence of an underlying constitutional violation.  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.") (emphasis in original)); *Watkins v. Ramcharan*, 775 F. App'x. 671, 672 (11th Cir. 2019) (affirming district court's dismissal of Plaintiff's failure to train claims against Sheriff under *Monell* because he was "unable to demonstrate that any underlying constitutional violation had occurred."); *Best v. Cobb Cnty.*, 239 F. App'x. 501, 505 (11th Cir. 2007) (concluding that there can be no municipal liability for failure to train without an underlying constitutional violation by the officer); *Rooney v. Watson*, 101 F.3d 1378, 1381 n. 2 (11th Cir. 1996) (stating that the plaintiffs' "failure to train"

26

claim could not exist independent of an underlying constitutional violation).

Since none of the Defendants involved in Plaintiff's arrest used excessive force, Plaintiff cannot possibly allege any facts that could state a claim against Sheriff Taylor for failure to train.

## D.    Count V: Fourteenth Amendment Substantive Due Process Violation

Count V of Plaintiff's Complaint alleges that all Defendants violated his substantive due process rights under the Fourteenth Amendment by "allowing Plaintiff to be attacked by K-9 Kimbo regardless of his total compliance with officer's instructions and the fact that Plaintiff presented no threat of bodily harm whatsoever to the officers." (Dkt. 52 ¶¶ 129–131.)  Defendants correctly point out that the use of force during an arrest is governed by the Fourth Amendment's reasonableness standard, not the Fourteenth Amendment's substantive due process standard.  (Dkt. 42-1 at 19); *see Graham*, 490 U.S. at 488 ("We hold that [excessive force] claims are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard.").  Thus, Plaintiff has no

viable claim under the Fourteenth Amendment for excessive force and Count V fails.

### E.    Count VI: Fourteenth Amendment Equal Protection Violation

Plaintiff's other Fourteenth Amendment claim fares no better. The Complaint alleges that "all Defendants denied Plaintiff equal protection . . . under the Fourteenth Amendment" when "Plaintiff, a man in his fifties, was set upon by K-9 Kimbo." (Dkt. 52 ¶ 133.) Further, Plaintiff baldly claims the "Gwinnett County Sheriff's Office has a history of committing such acts against men." (*Id.* ¶ 134.) These conclusory allegations cannot sustain an equal protection claim.

To plead a plausible claim that Defendants violated his right to equal protection, Plaintiff had to allege "that (1) he is similarly situated with other p[ersons] who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest." *Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001) (internal quotation marks omitted). The Complaint identifies no comparator and, even if it did, Plaintiff identifies no disparate treatment. Plaintiff's only explanation for this is that he "anticipates discovery will bear out that sleeping women have not been subjected to K-9 attack." (Dkt. 46 at 32.)

But "discovery *follows* a well-pleaded complaint; not the other way around." *Carter v. DeKalb Cnty., Ga.*, 521 F. App'x 725, 729 (11th Cir. 2013).  Plaintiff's allegations fail to state a plausible claim under the equal protection clause and must be dismissed.

### F.    Counts IX & X: Pre-Trial Incarceration Claims

Plaintiff brings a claim against Deputy Perez and Sheriff Taylor in their individual capacities (Count IX) and against Sheriff Taylor in his official capacity (Count X) for "abuse during pre-trial incarceration" under the Fourteenth and Fourth Amendments.[6]  (Dkt. 52 ¶¶ 144–165.) From the Complaint, the Court has difficulty understanding the factual basis for these claims.  Plaintiff's Response Brief, however, seems to clarify that he challenges the process he received prior to being placed in solitary confinement.  (Dkt. 46 at 33–34 ("These facts and allegations show that [Plaintiff] states a claim that the disciplinary proceedings were

---

[6] The constitutional rights of pre-trial detainees are determined by the Fourteenth Amendment, not the Fourth.  *Piazza v. Jefferson Cnty., Alabama*, 923 F.3d 947, 952 (11th Cir. 2019) ("[I]t is the Fourteenth Amendment that protects those who exist in the in-between—pretrial detainees.").  This distinction does not affect the Court's analysis, but it will disregard Plaintiff's arguments to the extent they rely solely on the Fourth amendment.

constitutionally inadequate. . . . Accordingly, the process given to plaintiff was insufficient to satisfy the Due Process Clause and this count [sic] should stand.").) Defendants also treat Counts IX and X as asserting procedural due process claims, and Plaintiff does not dispute that characterization. *See* Dkt. 42 at 20–22. So that is how the Court addresses them.[7]

"The minimum requirements of due process for prisoners facing disciplinary action [] are (1) advance written notice of the charges; (2) a written statement of the reasons for the disciplinary action taken; and (3) the opportunity to call witnesses and present evidence, when consistent with institutional safety and correctional goals." *Bass v. Perrin*, 170 F.3d 1312, 1318 (11th Cir. 1999); *see Young v. Jones*, 37 F.3d 1457, 1460 (11th Cir. 1994) ("[T]he [Supreme] Court [has] indicated a reluctance to review the judgments of prison administrators and

---

[7] Once more, the Court has tried its best to understand and fairly characterize Plaintiff's theories of liability, this time for his pre-trial incarceration claims. Given the redundancy of Counts IX and X, bare-bones factual allegations contained in those counts, and non-specific references to "constitutional rights," this was no easy task. Again, to the extent the Court misunderstands anything, the fault lies with Plaintiff.

30

acknowledged that prison disciplinary proceedings do not require the 'full panoply of rights' due a defendant in a criminal proceeding.").

Plaintiff's Complaint fails to allege *any* facts suggesting he was not afforded one or more of these due process requirements. In fact, other than one conclusory allegation that "what Plaintiff was provided was not due process" (Dkt. 52 ¶ 153), and a vague suggestion that Plaintiff's plea agreement was unfair (*Id.* at ¶ 152), the Court cannot discern any allegations suggesting Plaintiff partook in a disciplinary proceeding at all, much less a procedurally deficient one. Without these allegations, the Complaint fails to plausibly state a claim for a procedural due process violation.[8]

---

[8] The prisoner disciplinary records attached to Defendants' complaint further confirm that Counts IX and X fail. Those records provide uncontroverted evidence that Plaintiff received each of the three procedural due process requirements for prisoners facing disciplinary actions. (Dkt. 53-2 at 3 (Plaintiff's signature on hearing form listing disciplinary charges against him); 4–5 (written statement of reasons for disciplinary action); 6–7 (hearing results describing how Plaintiff presented his case to the disciplinary board but accepted a plea deal prior to the conclusion of the hearing).) Plaintiff's sole objection to the Court's consideration of those records at this stage is the same "completeness" argument previously raised regarding the bodycam footage. (Dkt. 46 at 6.) As explained above, that argument does not counter a finding that a document is "central" and "undisputed." But the Court need not (and

### G.    State-Law Claims

Plaintiff asserts Georgia-law claims for "arrest abuse" (Count VIII) against all Defendants and "prisoner abuse" (Count XI) against Deputy Perez and Sheriff Taylor. (Dkt. 52 ¶¶ 140–43, 166–170.) Defendants say these claims are barred by Georgia's doctrine of official immunity. (Dkt. 42-1 at 23.) The Court agrees.

Under the doctrine of official immunity, police officers "are subject to suit only when they negligently perform or fail to perform their ministerial functions or when they act with actual malice or intent to cause injury in the performance of their official functions." *Peterson v. Baker*, 504 F.3d 1331, 1339 (11th Cir. 2007); *see Bailey v. Wheeler*, 843 F.3d 473, 485–86 (11th Cir. 2016). Plaintiff does not—and could not—dispute that Defendants were performing official, non-ministerial functions when they arrested Plaintiff and subjected him to discipline in jail. *See Marshall v. Browning,* 712 S.E.2d 71, 74 (Ga. App. 2011) ("We conclude … [that Defendant police officer] was acting within her discretionary authority in investigating the case, obtaining search and

---

does not) consider these items in deciding Plaintiff's allegations are insufficient to state plausibly a due process claim.

arrest warrants, and in executing those warrants.")  So official immunity applies here unless Plaintiff can show Defendants acted with actual malice or intent to injure.  *See Smith v. LePage*, 834 F.3d 1285, 1297 (11th Cir. 2016); *Porter v. Massarelli*, 692 S.E.2d 722, 726 (Ga. Ct. App. 2010).

"Actual malice is a demanding standard."  *Black v. Wigington*, 811 F.3d 1259, 1266 (11th Cir. 2016).  It requires "a deliberate intention to do wrong and denotes express malice or malice in fact."  *Wilson v. Cromer*, 847 S.E.2d 213, 217 (Ga. Ct. App. 2020).  "Implied malice," "deliberate indifference," "reckless disregard for the rights and safety of others," "unreasonable conduct," "frustration," "irritation," "anger," and "ill will" are all insufficient.  *Id.*; *Jones v. Walsh*, 711 F. App'x 504, 507 (11th Cir. 2017); *Williams v. Fulton Cnty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1145 (N.D. Ga. 2016).  "[M]alice in this context means badness, a true desire to do something wrong."  *Peterson*, 504 F.3d at 1339.

"Intent to injure" is also a high bar.  *Wells for Chambers v. Talton*, 695 F. App'x 439, 447 (11th Cir. 2017).  It requires "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury."  *Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999).  'This definition of intent contains aspects of malice, perhaps a

wicked or evil motive." *Id.* Indeed, some courts have suggested it's part of the actual malice requirement rather than an independent principle. *See Williams*, 181 F. Supp. 3d at 1144 n.34 ("[I]t is not clear whether 'actual malice' and 'actual intent to cause injury' are in fact separate and distinct principles."); *Williams v. DeKalb Cnty.*, 840 S.E.2d 423, 434 (Ga. 2020) ("A 'deliberate intention to do wrong' such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs.").

The Court has already concluded Defendants used reasonable force in arresting Plaintiff and did not deprive him of due process during his pre-trial incarceration. But, even if the Court were wrong about that, no allegations suggests Defendants intended to do wrong or cause harm to the degree required to defeat immunity. If anything, the bodycam footage suggests Defendants acted with restraint and professionalism throughout their encounter with Plaintiff. And Plaintiff makes no allegations that plausibly allege Deputy Perez or Sheriff Taylor acted with actual malice or intent to injure with regards to his disciplinary hearing. There is simply no indication that any Defendant acted with malice or intended to harm Plaintiff. Official immunity thus applies.

## IV.    Conclusion

The Court **GRANTS** Defendants' motions for judgment on the pleadings.  (Dkts. 54, 55).  The Court **DIRECTS** the Clerk to close this case.

**SO ORDERED** this 10th day of September, 2025.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE